JOSEPH TESTA, on behalf of           )
SAMUEL J. TESTA                      )
                                     )
            Plaintiff,               )
                                     )   No. 15 C 02449
      v.                             )
                                     )   Judge Edmond E. Chang
EMERITUS CORPORATION,                )
d/b/a EMERITUS AT ORLAND PARK,       )
                                     )
            Defendant.               )
                                     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Joseph Testa brings this personal-injury action on behalf of his father, Samuel Testa, to recover monetary damages for harms Samuel allegedly suffered during his stay at Emeritus at Orland Park, an assisted living facility operated by Defendant Emeritus Corporation. The lawsuit was originally filed in the Circuit Court of Cook County, but Emeritus properly removed it. R. 1, Not. Removal.[1] Emeritus believes that the claims in the action are subject to arbitration,

---

[1]Citations to the docket are noted as "R.," followed by the entry number. The Court has subject-matter jurisdiction based on diversity of the parties under 28 U.S.C. § 1332. Specifically, Joseph and Samuel are citizens of Illinois, and Emeritus is considered a citizen of Washington because it is incorporated and maintains its principal place of business there. Not. Removal at 2. A defendant in a removed case may establish the required amount-in-controversy for diversity jurisdiction with a good-faith estimate of the stakes, so long as that estimate is plausible and supported by a preponderance of the evidence. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir. 2006). Emeritus's estimation that the jurisdictional amount is satisfied is both plausible and supported by a preponderance of the evidence. Joseph's attorney's affidavit alleged damages "in excess of $50,000.00." R. 1, Exh. A., Affidavit of Damages. And given the nature of the injuries alleged, which include a number of falls, resulting in fractured bones, as well as a stroke, *see* R. 1, Exh. A., State Court Compl. ¶¶ 8-19, it is not legally impossible that the total of damages alleged would surpass $75,000. Because it is not "legally impossible" that the value of the lawsuit to

which it moves to compel as well as to stay judicial proceedings. R. 8, Def.'s Mot. For the reasons explained below, although some of the parties' arguments are rejected, the Court needs supplemental briefing before definitively deciding Emeritus's motion.

## I. Background

The relevant facts are not in dispute. Samuel Testa was admitted to Emeritus at Orland Park (the Opinion refers to both the facility itself and the company as "Emeritus") on October 25, 2012. Compl. ¶ 5. On November 1, 2012, exercising a power of attorney for his father, Joseph Testa executed an "Assisted Living Establishment Contract" governing the terms of Samuel's residence at Emeritus. *See* R. 8, Exh. 2, Establishment Contract. Three weeks later, on November 22, Joseph signed, as Samuel's "Authorized Representative," another agreement with Emeritus. R. 8, Exh. 1, Arbitration Agreement. The agreement is entitled, "Agreement to Resolve Disputes by Binding Arbitration,[2] and it states in relevant part that:

> any action, dispute, claim or controversy of any kind, whether in contract or in tort, statutory or common law, personal injury, property damage, legal or equitable or otherwise, arising out of the provision of assisted living services, healthcare services, or any other goods or services provided under the terms of any agreement between the Parties, including disputes involving the scope of this Arbitration Agreement, or any other dispute involving acts or omissions that cause damage or injury to either

---

Joseph exceeds $75,000, the amount-in-controversy requirement is satisfied and removal was proper. *Back Doctors Ltd. v. Metropolitan Property and Cas. Ins.*, 637 F.3d 827, 829-30 (7th Cir. 2011).

[2]The pleadings do not state that it was Emeritus that drafted the Arbitration Agreement for the parties to sign, but this fact is offered by both sides in their respective briefs. *See* R. 11, Pl.'s Resp. Br. at 2; R. 12, Def.'s Reply Br. at 11.

Party, except for matters involving evictions, *shall be resolved exclusively by binding arbitration* and not by lawsuit or resort to the judicial process, except to the extent that applicable law provides for judicial review of arbitration proceedings.

R. 8, Exh. 1, Arbitration Agreement at 1 (emphasis in original). The Arbitration Agreement further provides that "[a]dmission to [Emeritus] is not contingent upon signing this Agreement." *Id*. at 2. No representative of Emeritus evidently signed the Agreement. *See id*. ("Community Representative Signature" line left blank).

Before Joseph signed either the Establishment Contract or the Arbitration Agreement on his father's behalf, Samuel had given Joseph two powers of attorney: an Illinois Statutory Short Form Power of Attorney for Health Care ("Illinois POA") dated June 2010, R. 12, Exh. B Illinois POA, and a durable power of attorney entered into under Arizona state law and dated March 2001 ("Arizona POA"), R. 12, Exh. A, Arizona POA. The purpose of the Illinois POA, according to its own terms in a prefatory notice, is to give Joseph "broad powers to make health care decisions, including … to require, consent to or withdraw any type of personal care or medical treatment for any physical or mental condition and to admit [Samuel] to or discharge [him] from any hospital, home or other institution." Illinois POA at 1. Consistent with this purpose, Section 1 of the Illinois POA gives Joseph the authority to make "personal care, medical treatment, hospitalization, and health care" decisions. *Id*. The Illinois POA also specifies that it "is intended to be as broad as possible so that [Joseph] will have authority to make any decision [Samuel] could make to obtain or terminate any type of health care." *Id*. at 2. It then goes on to list excerpts from the Illinois Power of Attorney for Health Care Law, including a

provision that, relevant here, reads, "The agent may sign and deliver all instruments, negotiate and enter into all agreements and do all other acts reasonably necessary to implement the exercise of the powers granted to the agent." *Id*. at 5 (quoting Section 4-10 of Illinois Power of Attorney Act, provision concerning statutory short form power of attorney for health care, 755 ILCS 45/4-10(c)).

The Arizona POA has two operative articles, granting powers over "asset control" and "health care decisions." Article 1 states broadly that Joseph "shall have full power and authority to do any and all acts for [Samuel's] benefit which [Samuel] might do if [he] were present." Arizona POA at 2. Several examples of such acts are then listed, "by way of illustration but not by way of limitation," including "to ask, demand, sue for … sums of money," "to sell, assign, and transfer stocks" and other securities, "to borrow money," "to manage real property," and "to make and verify income tax returns." *Id*. at 2-3. One other expressly listed act is "to retain counsel on [Samuel's] behalf, to appear for [him] in all actions and proceedings to which [he] may be party in the courts of Arizona or elsewhere, to commence actions and proceedings in [his] name and to sign and verify [his] name on all complaints, petitions, answers and other pleadings of every description." *Id*. at 3.

In January 2015, Joseph filed suit on behalf of Samuel in Cook County Circuit Court, alleging that Samuel—who left Emeritus in March 2014—had suffered physical injuries, including fractured bones, as a result of Emeritus's negligence during his stay. Compl. ¶¶ 8-19, 23-27. Emeritus properly removed the

action to this Court in March 2015, Not. Removal, and now moves to compel arbitration and stay judicial proceedings under the arbitration agreement that Joseph signed on November 22, 2013. Def.'s Mot.

## II. Legal Standard

Under the Federal Arbitration Act, if the parties have an arbitration agreement and the asserted claims in a lawsuit are within its scope, a motion to compel arbitration must be granted. 9 U.S.C. §§ 3-4; *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004) (citing *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999)). The Act "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Accordingly, Section 3 of the Act requires granting a motion to stay a lawsuit where "the issue involved in such suit ... is referable to arbitration" under a written agreement. 9 U.S.C. § 3. And Section 4 requires that the court order the parties to proceed in arbitration if there is an agreement to arbitrate. 9 U.S.C. § 4.

"Although it is often said that there is a federal policy in favor of arbitration, federal law places arbitration clauses on equal footing with other contracts, not above them." *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 740 (7th Cir. 2010) (citing *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010)). "Any 'preference' for arbitration is reserved for the interpretation of the scope of a valid arbitration clause." *Id.* at 740 (citing *AT & T Techs., Inc. v. Communications*

*Workers of Am.*, 475 U.S. 643, 649-50 (1986)). Before staying judicial proceedings and compelling arbitration, it is generally for the court to decide whether a contract containing an arbitration clause exists at all. *See Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 296 (2010). Whether a binding arbitration agreement exists is determined under principles of state contract law. *Janiga*, 615 F.3d at 742 (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 934 (1995)).

## III. Analysis

Joseph Testa does not dispute that his father Samuel's personal-injury claim falls within the scope of the Arbitration Agreement that Joseph signed on Samuel's behalf. Instead, Joseph offers three theories for why the Agreement was invalid to start with: lack of consideration, lack of mutual assent, and because Joseph never had the authority to bind Samuel to arbitration under the POAs. The first two of these arguments are meritless under Illinois law. As for the third, concerning the scope of Joseph's authority, the Court must reserve judgment pending further briefing from the parties.

### A. Consideration for Arbitration Agreement

Under Illinois law, "[w]here there is no other consideration for a contract, the mutual promises of the parties" is ordinarily sufficient to "constitute the consideration." *Carter v. SSC Odin Operating Co.*, 976 N.E.2d 344, 351 (Ill. 2012) (quoting *Armstrong Paint & Varnish Works v. Continental Can Co.*, 133 N.E. 711, 714 (Ill. 1921)); *accord Bishop v. We Care Hair Dev. Corp.*, 738 N.E.2d 610, 623 (Ill.

App. Ct. 2000). Notwithstanding this principle, Joseph contends that the Arbitration Agreement should not be given effect because the company's end of the bargain was, according to Joseph, illusory: specifically, the exception the Agreement makes for "matters involving evictions" is a "loophole that allows [Emeritus] to avoid arbitration for virtually all claims … rendering its 'promise' to arbitrate meaningless." Pl.'s Resp. Br. at 8-9. Joseph points to the Establishment Contract, which outlines several grounds for which Emeritus could properly terminate Samuel's residence at its facility, including non-payment of fees, failure to comply with other contractual terms, and Emeritus's reasonable belief that its facility is inappropriate for him. Establishment Contract at 11-12. Because the Establishment Contract gives Emeritus such broad grounds to terminate its relationship with Samuel, the argument goes, an exception for eviction disputes in the arbitration agreement is "more expansive than it appears," in effect allowing Emeritus to evade arbitration nearly at will by invoking "destruction of property, unpaid rent, and countless other claims … seemingly unrelated to eviction." Pl.'s Resp. Br. at 10 (arguing that Samuel, by contrast, cannot institute eviction proceedings as the tenant and has "waived his right to litigation").

The eviction carve-out is not the rule-swallowing exception that Joseph portrays. Although it is true that a range of grievances could, in theory, underlie an eviction action, it hardly follows that the exception is therefore an end-around that renders the entire arbitration-promise illusory on Emeritus's part. Joseph cites to *Vassilkovska v. Woodfield Nissan, Inc.*, 830 N.E.2d 619 (Ill. App. Ct. 2005), but that

case actually illustrates the counterpoint to Joseph's argument. In that case, the court held that an independent arbitration agreement between a car dealer and a buyer lacked consideration because it included so many exceptions that it "[left] no claim that [the dealer] would be required to submit to arbitration." *Id*. at 625. The agreement excepted a broad swath of claims from arbitration, including actions based on: the buyer's failure to pay amounts due under the purchase contract, the buyer's bad check, the buyer's failure to provide good title to a trade-in vehicle or the buyer's misrepresentation of any loans on the vehicle, a claim for replevin or repossession, and enforcement of a separate retail installment contract. *Id*. at 621, 626. In effect, the buyer waived his rights to sue for every foreseeable cause of action related to the purchase of a car, while the seller retained "the right to sue the plaintiff for a laundry list of reasons." *Id*. at 626. But that type of lack of mutuality does not define the Emeritus-Testa agreement at issue here. Any number of conceivable claims, based on contract or tort law, statutory or common law, could have arisen from Samuel's stay at the assisted-living facility that do not necessarily involve eviction proceedings, making them fully subject to arbitration *as against both parties*—including, notably, personal injury and negligence claims like the ones raised in this lawsuit. Thus, in contrast to the arbitration agreement in *Vassilkovska*, which was seemingly designed to hamstring the buyer in all disputes that might plausibly arise with the seller, the exception to the parties' promise to arbitrate here was truly limited and the arbitration-duty more or less reciprocal in effect.

Joseph's efforts to suggest otherwise by painting the eviction-clause as some sort of Trojan Horse is unfounded. The fact that only Emeritus as landlord could initiate an eviction action does not in itself constitute an imbalance invalidating the entire Arbitration Agreement. *See Gen. Motors Acceptance Corp. v. Johnson*, N.E.2d 30, 37 (Ill. App. Ct. 2004) ("While consideration is essential to the validity of a contract, mutuality of obligation is not.") (quoting *Vassilkovska*, 814 N.E.2d at 892-93). Joseph suggests instead, in essence, that the Agreement was tainted because Emeritus could have manipulated any dispute into the shape of an eviction proceeding in order to avoid arbitration. Needless to say, not only does this argument ignore the universe of potential claims that could have arisen (both in Samuel's favor and against) independently of any eviction, it amounts to nothing more than speculation as to how Emeritus might invoke the eviction clause. Accordingly, the attack on the eviction-exception as rendering Emeritus' promise illusory is groundless, and "proper consideration was given by way of the parties' mutual commitment to the unilateral election of arbitration." *Id*. at 38.

## B. Mutual Assent to Arbitration Agreement

Joseph also asserts that the Arbitration Agreement lacked mutual assent because Emeritus never signed the document. Pl.'s Resp. Br. at 10-11. Emeritus concedes that it did not sign the Agreement, but counters that the lack of a signature is not dispositive on the question of assent in its case. Def.'s Reply Br. at 10-11. Emeritus is correct.

In Illinois, "a signature is not always essential to the binding force of an agreement. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, as, for example, by acts or conduct of the parties." *Lynge v. Kunstmann*, 418 N.E.2d 1140, 1144 (Ill. App. Ct. 1981) (citations omitted); *see also Hedlund & Hanley, LLC v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 876 N.E.2d 1, 6 (Ill. App. Ct. 2007). Only where signatures are an expressly-required condition-precedent of an agreement will their absence render the contract voidable. *Lynge*, 418 N.E.2d at 1144 (citing *S. N. Nielsen Co. v. Nat'l Heat & Power Co.*, 337 N.E.2d 387, 391 (Ill. App. Ct. 1975)).

Applying this state-law standard, the federal district court in *McMahan v. Rizza Chevrolet, Inc.*, 2006 WL 2560883 (N.D. Ill. Aug. 31, 2006), considered facts very similar to those at issue here. Even though the defendant car-dealer had not signed the arbitration agreement in that case (unlike the underlying purchase contract, which both parties signed), the court held that the defendant's actions in producing the agreement in the first place and then attaching it to the purchase contract indicated its assent to be bound. *Id*. at *2. Likewise here, it was Emeritus who produced the Arbitration Agreement for Joseph's consideration and the company retained the document once Joseph had signed it. There was no language in the Agreement, moreover, that made both parties' signatures a requirement for full execution. Accordingly, there can be little doubt that Emeritus intended to be bound by the terms of the Agreement.

The only case Joseph cites to support his position, *Carlton at the Lake, Inc. v. Barber*, 928 N.E.2d 1266 (Ill. App. Ct. 2010), is distinguishable. In *Barber*, a nursing home tendered a written contract to a resident's daughter and attorney-in-fact, which neither the daughter nor the nursing home ever signed. *Id.* at 1269. The nursing home sought to bind the resident, arguing that the daughter had accepted the contract's terms by later placing her father into the nursing home and signing various other admission forms. *Id.* at 1270. The court held that the parties had not formed a valid contract because the Nursing Home Care Act, 210 ILCS 45/1-101 *et seq.*, requires any contract between a nursing home and its resident to be signed by the nursing home's agent. *See Barber*, 928 N.E.2d at 1271 (citing Department of Public Health administrative rules governing contracts between residents and care facilities, 77 Ill. Admin. Code § 300.630). Importantly, assisted living facilities like Emeritus are *not* subject to the administrative rules the court relied on in *Barber*. *See* 77 Ill. Admin. Code § 300.330 (excluding "assisted living" facilities from the definition of "facility or long-term care facility"). Since there was no statutory requirement that Emeritus sign the Arbitration Agreement, ordinary Illinois standards for establishing assent, which do not always require a signature, apply. As Emeritus produced the Agreement in question and sought its execution, there was mutual assent to support its validity.

### C. Joseph's Authority to Bind Samuel to Arbitration

Although there was adequate consideration and mutual assent to support the Arbitration Agreement, Emeritus's motion to compel arbitration stalls, at least for

the time being, on the issue of the scope of Joseph's authority to bind his father to the Agreement in the first place. Emeritus relies on both the Illinois and Arizona POAs to assert that Joseph had the appropriate authority, so it is necessary to examine principles of agency law under both Illinois and Arizona law. *See* Illinois POA (invoking Illinois Power of Attorney Act, 755 ILCS 45/4-1 *et seq*.); Arizona POA at 4 ("This instrument shall be governed by the laws of the State of Arizona in all respects[.]"). Right now, because no material facts are disputed (at least the parties have not identified any), the Court can decide the issue as a matter of law. *See Goodman v. Physical Resource Engineering, Inc.*, 270 P.3d 852, 857 (Az. Ct. App. 2011); *Daniels v. Corrigan*, 866 N.E.2d 1193, 1204 (Ill. App. Ct. 2008).

An agent's authority to act in the principal's stead can be either actual or apparent in nature. *See Patrick Engineering, Inc. v. Naperville*, 976 N.E.2d 318, 329 (Ill. 2012); *Ruesga v. Kindred Nursing Centers, LLC*, 161 P.3d 1253, 1261 (Az. Ct. App. 2007). Actual authority in turn may be either express or implied: express authority is granted by the principal explicitly "in very specific or detailed language"; implied authority exists when an agent acts according to the principal's perceived wishes "based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objective and other facts known to the agent." Restatement (Third) of Agency § 2.01 cmt. b (2006). Apparent authority, meanwhile, is found "where a principal has created the appearance of authority in an agent, and another party has reasonably and detrimentally relied upon the agent's authority." *Patrick*, 976 N.E.2d at 329-30 (citing *Petrovich v. Share Health*

*Plan of Illinois, Inc.*, 719 N.E.2d 756, 765 (Ill. 1999)); *Curran v. Indus. Comm'n of Arizona*, 752 P.2d 523, 526 (Az. Ct. App. 1988) (The apparent, or ostensible, agent is "one where the principal has intentionally or inadvertently induced third persons to believe that such a person was its agent although no actual or express authority was conferred on him as agent.") (quoting *Gulf Ins. Co. v. Grisham*, 613 P.2d 283, 286 (Az. 1980)). The party alleging an agency relationship must prove it by a preponderance of the evidence. *See Granite Properties Ltd. Partnership v. Granite Inv. Co.*, 581 N.E.2d 90, 92 (Ill. App. Ct. 1991); *Curran*, 752 P.2d at 526.

Emeritus argues that Joseph possessed each of these variants of authority and that, in the alternative, the parties effectively ratified the Agreement anyway, rendering the question of initial authority moot. As discussed later on in this opinion, Emeritus's contentions as to implied and apparent authority, as well as ratification, are without merit. Because the parties have not addressed any Arizona authority or two potentially outcome-determinative Illinois cases concerning the question of express authority, however, supplemental briefing is required on that issue alone.

## 1. Whether Joseph had Actual Express Authority Requires More Briefing

Emeritus argues in his reply brief that Joseph had actual, express authority to bind Samuel to arbitration by the terms of the two POAs: in particular, the language in Article 1 of the Arizona POA, concerning asset control, that grants Joseph "full power and authority to do any and all acts for [Samuel's] benefit," and the provisions in the Illinois POA giving Joseph power to make "personal care,

medical treatment, hospitalization, and health care" decisions and enter into related agreements. R. 12, Def.'s Reply Br. at 3-4 (quoting in part and summarizing in part language from POAs). In his response brief, Joseph, anticipating this line of argument, contends that such "catch all" provisions, including those in short-form statutory powers of attorney, cannot grant "plenary powers" to bind a principal to arbitration agreements without clear intent to do so. R. 10, Pl.'s Resp. Br. at 4-7. The parties' briefing is lacking in a couple of respects: first, neither addresses Arizona authority at all, despite the fact that the Arizona POA explicitly declares that Arizona's law shall govern its scope; second, their discussion does not take into account certain Illinois decisions that might well be dispositive. For now, the Court engages in an initial analysis to guide the parties when they address these shortcomings in supplemental submissions.

### a. Cases Cited by Parties

To begin, in an effort to show that Joseph's authority assumes in-court litigation, and not arbitration, Joseph points out that the Arizona POA contains language about his authority specifically in the context of legal proceedings. In particular, the Arizona POS says that Joseph may: "appear for [Samuel] in all actions and proceedings ... *in courts* of Arizona or elsewhere, to commence actions and proceedings in [Samuel's] name and to sign and verify in [Samuel's] name *all complaints, petitions, answers and other pleadings*[.]" *Id*. at 6 (citing Arizona POA at 2) (emphasis in Joseph's brief). Joseph argues that, in addition to the absence of any express mention of a right to enter into arbitration for his father, this

provision's specific reference to courts and court-filings "shows that Samuel intended for his agent to represent his interests in litigation, and not to forfeit his rights to a jury trial." *Id*. Joseph then cites *Fort Dearborn Life Ins. Co. v. Holcomb*, an Illinois case reiterating that, in the context of a power of attorney, "a catchall provision will not expand a specifically limited power absent clear evidence of the principal's intent that it do so." 736 N.E.2d 578, 586 (Ill. App. Ct. 2000) (quoting *In Re Guardianship of Mabry*, 666 N.E.2d 16, 21 (Ill. App. Ct. 1996)). Joseph does not specifically address the Illinois POA, but presumably he meant for his argument on the inefficacy of "catch all" "plenary powers" provisions to apply to it as well.

The problem is that—in addition to the incongruity that Joseph relies only on the *Illinois* decision to interpret the *Arizona* POA—*Holcomb* turned on the fact that the power of attorney in question was deemed a specific statutory short form (for property matters) that expressly prohibits an agent from taking the action at issue in that case, namely, changing beneficiaries under insurance policies. *See id*. at 587-88 (citing 755 ILCS 45/3-4). Even if *Holcomb*'s reasoning were applied to Joseph's Illinois POA, that document follows a separate statutory short form (for health law) which, more importantly, contains no similar specific exception to the agent's power at stake here, binding a principal to arbitration. Thus, without more analysis, *Holcomb* (which Emeritus ignores in its brief) is not necessarily the long and short of it on short-form powers of attorney (or Arizona POAs).

Nor is *Curto v. Illini Manors, Inc.*, 940 N.E.2d 229 (Ill. App. Ct. 2010), the only case both parties discuss in detail on the issue. *Curto* invalidated an

arbitration agreement signed by a wife on behalf of her husband, a nursing home resident. Unlike in the Testas' case, there was not even a generalized power of attorney involved; the narrow question settled was whether, absent no other evidence, the fact of marriage is enough to convey authority (the answer is no). *Id.* at 233-34. The court did observe, but only in dictum, that "[e]ven where a health care power of attorney [is] present," courts (but not specifically courts in Illinois or Arizona) have "held that a health care power of attorney granted for medical decisions does not confer authority to sign an arbitration agreement waiving legal rights." *Id.* at 234 (collecting cases from Georgia, Colorado, Texas, Mississippi, and Florida). In any event, *Curto*'s actual holding appears less relevant to this case than some other cases left unmentioned by the parties, which this opinion now discusses.

### b. *Nichols* and *Fiala*

Two Illinois cases, although not cited by either party (one because it was only issued after the motion was fully briefed), merit attention. The first appears to more clearly support the argument that catch-all provisions have limited effect. In *Estate of Nicholls v. Nicholls*, a nephew acting under a power of attorney from his uncle made himself the beneficiary of his uncle's certificates of deposit. 960 N.E.2d 78, 79-80 (Ill. App. Ct. 2011). The POA had enumerated certain banking powers, including the power to "acquire and redeem certificates of deposit"; it had also included broad language purporting to allow "all such actions which [the principal] could do if personally present," while clarifying that any specifically enumerated powers were not meant to "limit or restrict the general durable powers" of the nephew. *Id.* at 81-

82. The Illinois Appellate Court held that such "catch all" language could not make up for the absence of an express provision allowing the nephew to change beneficiaries, which the court found necessary even beyond the provision allowing him to "acquire or redeem certificates of deposit." *Id*. at 83.

*Nichols* relied in part on commentary in the Restatement (Second) of Agency, which looks unfavorably on broad generic grants of authority to agents. One comment states, "[W]here general terms are used which literally purport to grant great authority, such terms will normally be interpreted as authorizing the agent to act only in connection with the business the agent is employed to perform. The more specific the enumeration of acts to be done, the smaller the area to be included in the general statement." Restatement (Second) of Agency § 37 cmt. a (1958). Another reads, "All-embracing expressions are discounted[,] discarded[, or] disregarded as meaningless verbiage." *Id*. § 34 cmt. h (1958) (giving example of phrase like "hereby ratifying and confirming whatever our agent shall do"). Other courts have similarly looked to these comments and the sections they describe as persuasive authority. *See Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 759 N.E.2d 174, 182 (Ill. App. Ct. 2001) ("[A] general grant of agency does not carry with it the power to execute guaranties."); *Holcomb*, 736 N.E.2d at 589; *Ping v. Beverly Enters.*, 376 S.W.3d 581, 591-93 (Ky. 2012) (no actual authority to enter arbitration agreement with nursing home on mother's behalf).

The second case, decided after the parties submitted their briefs, involved a situation where an agent *can* bind his principal to arbitration on the basis of a

broadly-worded, non-arbitration-specific grant of authority. *Fiala v. Bickford Senior Living Grp.* 32 N.E.3d 80 (Ill. App. Ct. 2015), considered whether an agent acting pursuant to the Illinois Powers of Attorney for Health Care Law could sign a binding arbitration clause in a contract for assisted living services. The power of attorney stated that "[t]he agent may sign and deliver all instruments, negotiate and enter into all agreements and do all other acts reasonably necessary to implement the exercise of the powers granted to the agent." *Id.* at 89. Because the arbitration provision was neither optional nor freestanding, but an *integral* part of the patient's underlying admission to the assisted living facility, the court held that it fell within the scope of the agent's authority to make health-care decisions. *See id.* at 92 ("[I]f an arbitration provision is required for admission to a care facility then it becomes part and parcel of the health-care decision to admit the patient to the facility."). Courts in other jurisdictions have embraced this principle, and its corollary that the "decision to sign a free-standing arbitration agreement is not a health care decision"—and thus outside the scope of a generic grant of authority over health care decisions—"if the patient may receive health care without signing the arbitration agreement." *Dickerson v. Longoria*, 995 A.2d 721, 739 (Md. 2010); *see also, e.g., Life Care Centers of Am. v. Smith*, 681 S.E.2d 182, 185 (Ga. Ct. App. 2009); *Koricic v. Beverley Enterprises–Nebraska, Inc.*, 773 N.W.2d 145, 151 (Neb. 2009); *but see Owens v. Nat'l Health Corp.*, 263 S.W.3d 876, 885 (Tenn. 2007) (dismissing attempt to draw line between agent's health care decisions and legal

18

decisions on behalf of principal to find agent was authorized to sign nursing-home contract, including arbitration provision).

### c. Directions for Additional Briefing

The takeaway from this lengthy discussion is that the parties have not analyzed the issue of actual authority enough to allow for a decision on the issue.[3] First, the parties have not briefed at all Arizona authority, despite the fact that the Arizona POA explicitly is governed by that State's law. Reflective of, or perhaps as a result of, that failure, the parties have not made any real attempt to separate out the effects of the Illinois and Arizona POAs as the purported source of Joseph's authority as attorney, even though they arguably have distinctive terms and are subject to separate legal analyses—in particular, the fact that the Illinois POA is a statutory short form may raise issues not applicable to the Arizona POA. *See, e.g.*, *Holcomb*, 736 N.E.2d at 587-88. Second, the Illinois decisions in *Nichols* and *Fiala* do appear to provide guidance relevant to the motion. Where that guidance leads is still up for the parties to argue, based on their interpretations of the facts about the particular POAs here and their fit, if any, with the standards articulated by *Nichols* and *Fiala*. The parties are directed to address these issues (and these issues alone) in supplemental briefing to be filed according to the schedule set at the end of this opinion.

---

[3]Part of the incompleteness of the briefing stems from the fact that Emeritus first made its arguments about the efficacy of Joseph's power of attorney in Emeritus's reply brief. For his part, in his response brief, Joseph anticipated that Emeritus would rely on the Arizona POA, but there was no discussion of the Illinois POA. The additional briefing ordered by the Court should enable Emeritus to lay out its case for establishing the agency relationship between the Testas in full, and Joseph to respond in kind.

## 2. Joseph Did Not Have Implied or Apparent Authority

In contrast to the question of actual authority, the argument that Emeritus could rely on Joseph's implied or apparent authority to sign the Arbitration Agreement can be definitively ruled out. Emeritus contends that Joseph gave the reasonable impression that he had such authority because the Agreement listed him as Samuel's legal representative, he had signed the Establishment Contract for Samuel, paid Samuel's fees for Emeritus's services, and otherwise "managed his father's legal, medical, and financial affairs." Def.'s Reply Br. at 5. In its one total paragraph of argument on these two issues, Emeritus blends the two distinct concepts of implied (which is a variant of actual) authority and apparent authority (which is a concept separate from any form of actual authority), and fails to demonstrate that either agency relationship existed between the Testas.

Implied authority "arises when the conduct of the principal, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's behalf." *Curto*, 940 N.E.2d at 233 (citing Restatement (Second) of Agency § 26 (1958)).[4] In other words, it is concerned with the impression of a grant of specific power created *by the principal* in the mind of the agent; it is not enough to simply look at the objective actions of the agent after or during the fact. Emeritus offers nothing but the conclusory and unsupported gloss that Samuel "had" Joseph

---

[4]Unlike in the context of interpreting the possible express grant of authority in the POAs, which necessitates looking at Arizona law, the Court assumes, as the parties do, that only Illinois law governs whether Joseph had implied or apparent authority. This assumption rests on the fact that implied authority and apparent authority, rather than drawn from a document like the Arizona POA, are determined based on the behavior of the principal and other circumstances.

sign the Agreement, Def.'s Reply Br. at 5, which is hardly the same as a factual basis to argue that Samuel had inferentially created the impression that he wanted his son to specifically bind him to arbitration.[5] *See Curto*, 940 N.E.2d at 233 (implied authority requires "circumstances" like a "prior course of dealing of a similar nature between the alleged agent and principal or from a previous agency relationship") (citing *Hartshorn v. State Farm Insurance Co.*, 838 N.E.2d 211 (Ill. App. Ct. 2005)).

Emeritus's argument about apparent authority fails for much the same reason. Apparent authority asks what "a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Patrick Engineering*, 976 N.E.2d at 318. Importantly, "[o]nly the alleged principal's words and conduct, not those of the alleged agent, establish the agent's authority." *Amcore*, 759 N.E.2d at 183. Again, Emeritus points only to conclusory allegations of *Joseph's* actions (he paid, he managed, he signed) to suggest the existence of authority; but labeling the very act that is sought to be validated as de facto proof of the power to carry it out is circular, to say nothing of the question of Emeritus's own (lack of) "diligence and discretion" in clarifying Joseph's authority. *See Alterman v. Lydick*, 241 F.2d 50 (7th Cir. 1957) (truck driver had apparent authority to sign lease because he was "clothed by" the principal in outward, objective "indicia of authority" like possession of truck and principal's

---

[5]Emeritus's cursory argument that Samuel should be estopped from claiming Joseph lacked authority to execute the Arbitration Agreement on the basis of the same conclusion that the father "had" the son sign it, Def.'s Reply Br. at 7, is similarly underdeveloped and meritless.

registration documents, and such delegation was customary practice). Accordingly, Emeritus's contention that Joseph had implied or apparent authority to sign the Arbitration Agreement is rejected.

### 3. Samuel did not Ratify the Arbitration Agreement

Finally, the Court can also outright reject Emeritus's argument that, even if Joseph lacked authority to sign the Arbitration Agreement, Samuel ratified it. "Ratification occurs when the principal learns of an unauthorized transaction, then retains the benefits of the transaction or takes a position inconsistent with nonaffirmation." *Stathis v. Geldermann, Inc.*, 692 N.E.2d 798, 808 (Ill. App. Ct. 1998) (citation omitted). Emeritus asserts that Samuel's continuing to reside at Emeritus, as well as paying for and receiving services there, for over a year after the Arbitration Agreement was signed constituted a "classic example of ratification." R. 12, Def.'s Reply Br. at 7.

Emeritus conflates a purported ratification of the Arbitration Agreement with the unrelated performance of the underlying Establishment Contract. The two documents, remember, were drawn up and executed independently of each other, the former signed three weeks after the latter and Samuel's arrival at Emeritus. Nor was the Arbitration Agreement a necessary condition of the Establishment Contract: according to the Arbitration Agreement's own terms, "Admission to the Community [was] *not* contingent on signing [the] Agreement." Arbitration Agreement at 2 (emphasis added). Thus, that Samuel continued to reside at Emeritus according to independently agreed-to terms says nothing about what he

thought about the separate promise to arbitrate (which had no bearing on whether Samuel got to remain in the facility or on the services and benefits he would receive), nor does it evince "a position inconsistent with nonaffirmation" in any way. *See All American Roofing, Inc. v. Zurich American Ins. Co.*, 934 N.E.2d 679, 696-97 (Ill. App. Ct. 2010) (employer's acceptance of insurance coverage under different contracts did not signify acceptance of separate program agreements bearing arbitration clauses). The cases relied on by Emeritus are readily distinguishable, dealing with *single* agreements that the principals were found to have adopted. *See Stathis v. Geldermann, Inc.*, 692 N.E.2d 798, 808 (Ill. App. Ct. 1998); *McCracken v. Olson Companies, Inc.*, 500 N.E.2d. 487, 493 (Ill. App. Ct. 1986). Accordingly, Emeritus cannot compel arbitration on the grounds that Samuel ratified the Arbitration Agreement.

## IV. Conclusion

For the reasons discussed above, certain arguments are rejected: Joseph Testa's contentions that the Arbitration Agreement lacked consideration and mutual assent; and Emeritus's arguments that the Agreement was based on Joseph's implied or apparent authority as Samuel's agent, and that Samuel ratified the Agreement. But Emeritus's motion to compel arbitration is entered and continued, pending additional briefing. The parties must submit additional briefing on the issue of Joseph's actual, express authority to bind Samuel to arbitration on the basis of the Illinois and Arizona powers of attorney. Emeritus shall submit its brief, addressing this issue only, by September 18, 2015. Joseph Testa shall respond

by October 2, 2015. Emeritus may file a reply no later than October 9, 2015. The status hearing of September 18, 2015, is reset to October 22, 2015, at 9:30 a.m.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: September 4, 2015