| | |
|---|---|
| JOSEPH TESTA, on behalf of SAMUEL J. TESTA, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| EMERITUS CORPORATION, d/b/a EMERITUS AT ORLAND PARK, | ) ) ) |
| Defendant. | ) ) |

No. 15 C 02449

Judge Edmond E. Chang

## MEMORANDUM OPINION AND ORDER

Joseph Testa brings this personal-injury action on behalf of his father, Samuel Testa, to recover for injuries that Samuel allegedly suffered when he lived at an assisted living facility run by Emeritus Corporation.[1] Emeritus believes that a valid arbitration agreement binds the parties, so the company moved to compel arbitration. In response, the Testas argue that the arbitration agreement is invalid. In an earlier opinion, the Court explained why the validity determination boiled

---

[1]Joseph Testa originally filed this action in the Circuit Court of Cook County, but Emeritus properly removed it. R. 1, Not. Removal. The Court has diversity jurisdiction under 28 U.S.C. § 1332. Joseph and Samuel are citizens of Illinois, and Emeritus is a citizen of Washington because Emeritus is incorporated and maintains its principal place of business there. Not. Removal at 2. A defendant in a removed case may establish the required amount-in-controversy with a good-faith estimate of the stakes, so long as that estimate is plausible and supported by a preponderance of the evidence. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir. 2006). Emeritus's estimation of the jurisdictional amount is both plausible and supported by a preponderance of the evidence. Joseph's attorney's affidavit alleges damages "in excess of $50,000.00." R. 1, Exh. A., Damages Aff. And given the nature of the injuries alleged, which include a number of falls resulting in fractured bones, as well as a stroke, *see* R. 1, Exh. A, Compl. ¶¶ 8-19, it is not legally impossible that the total of damages alleged would surpass $75,000. *Back Doctors Ltd. v. Metro. Prop. and Cas. Ins.*, 637 F.3d 827, 829-30 (7th Cir. 2011).

down to one issue: whether either an Illinois power of attorney or an Arizona power of attorney signed by Samuel gave Joseph the actual, express authority to bind Samuel to the arbitration agreement. On consideration of the parties' supplemental briefs, the answer is no, so the Court denies Emeritus's motion to compel arbitration.

## I. Background

Many of the background facts, which are not in dispute, are taken from the prior Opinion. R. 18, 9/4/15 Opinion at 2-5, *Testa v. Emeritus Corp.*, 2015 WL 5183900 (N.D. Ill. Sept. 4, 2015).[2] Samuel Testa was admitted to Emeritus at Orland Park, an assisted living facility, on October 25, 2012. R. 1, Exh. A, Compl. ¶ 5. (For convenience's sake, this Opinion refers to both the facility itself and the company as "Emeritus."). On November 1, 2012, exercising a power of attorney for his father, Joseph Testa signed an "Assisted Living Establishment Contract," which set the terms of Samuel's residence at Emeritus. R. 8, Exh. 2, Establishment Contract. Three weeks later on November 22, Joseph signed, as Samuel's "Authorized Representative," a separate Arbitration Agreement with Emeritus. R. 20-4, Exh. 4, Arbitration Agreement. That second contract is entitled "Agreement to Resolve Disputes by Binding Arbitration," and it states in relevant part that "any action, dispute, claim or controversy of any kind … arising out of the provision of assisted living services, healthcare services, or any other goods or services provided under the terms of any agreement between the Parties … *shall be resolved*

---

[2] Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

*exclusively by binding arbitration … .*" *Id.* ¶ 2 (emphasis in original). The Arbitration Agreement further provides that "[a]dmission to the Community is not contingent upon signing this Agreement." *Id.* at 2.

Before Joseph signed either the Establishment Contract or the Arbitration Agreement on his father's behalf, Samuel had given Joseph two powers of attorney: (1) in June 2010, an Illinois Statutory Short Form Power of Attorney for Health Care ("Illinois POA"), R. 20-2, Exh. 2; and (2) in March 2001, an Arizona durable power of attorney ("Arizona POA"), R. 20-1, Exh. 1. The purpose of the Illinois POA, according to its prefatory notice, is to give Joseph "broad powers to make health care decisions, including … to require, consent to or withdraw any type of personal care or medical treatment for any physical or mental condition and to admit [Samuel] to or discharge [him] from any hospital, home or other institution." Illinois POA at 1. Consistent with this purpose, Paragraph 1 of the Illinois POA gives Joseph the authority "to make any and all … personal care, medical treatment, hospitalization, and health care" decisions. *Id.* ¶ 1. The Illinois POA also specifies that it "is intended to be as broad as possible so that [Joseph] will have authority to make any decision [Samuel] could make to obtain or terminate any type of health care." *Id.* The Illinois POA then sets forth Joseph's powers, some of which are quoted from the Illinois Power of Attorney Act's section on health-care power of attorneys, 755 ILCS 45/4-10. One provision is an enabling-type authority, meaning it gives Joseph the authority to execute the other powers: "The agent may sign and deliver all instruments, negotiate and enter into all agreements and do all other

acts reasonably necessary to implement the exercise of the powers granted to the agent." *Id*. at 5 (quoting 755 ILCS 45/4-10(c)).

The Arizona POA is premised on Arizona law. ARS § 14-5501 (governing durable power of attorney). Articles I, II, and III of the Arizona POA govern "asset control," "health care decisions," and "administrative provisions," in that order. Article I states broadly that Joseph "shall have full power and authority to do any and all acts for [Samuel's] benefit which [Samuel] might do if [he] were present." Arizona POA, art. I. Several examples are then listed "by way of illustration but not by way of limitation," including "to ask, demand, sue for … sums of money," "to sell, assign, and transfer stocks" and other securities, "to borrow money," "to manage real property," and "to make and verify income tax returns." *Id*. art. I ¶¶ 1-11. Another power is "to retain counsel on [Samuel's] behalf, to appear for [him] in all actions and proceedings to which [he] may be party in the courts of Arizona or elsewhere, to commence actions and proceedings in [his] name and to sign and verify [his] name on all complaints, petitions, answers and other pleadings of every description." *Id*. art. I ¶ 9.

In January 2015, Joseph filed suit on Samuel's behalf in Cook County Circuit Court, alleging that Samuel—who left Emeritus in March 2014—had suffered physical injuries, including fractured bones, as a result of Emeritus's negligence during his stay. Compl. ¶¶ 8-19, 23-27. Emeritus removed the action to federal court, R. 1, and then moved to compel arbitration under the Arbitration Agreement that Joseph signed on November 22, 2012. R. 8, Def.'s Mot. Compel.

In an earlier Opinion, the Court rejected Joseph's arguments that the Arbitration Agreement lacked consideration and mutual assent. 9/4/15 Opinion at 6-11. But at the same time, the Court also rejected Emeritus's agency arguments that Joseph had implied or apparent authority to enter into the Arbitration Agreement, *id.* at 20-21, as well as the argument that Samuel had ratified the Arbitration Agreement, *id.* at 22-23. What remained, the Court explained, was more briefing on whether Joseph had actual, express authority to bind Samuel to arbitration on the basis of the Illinois or Arizona powers of attorney. *Id.* at 11-19. As explained next, neither power of attorney granted Joseph the authority to enter into the Arbitration Agreement, so Emeritus's motion to compel arbitration is denied.

## II. Legal Standard

The Federal Arbitration Act, which applies to "[a] written provision … evidencing a transaction involving commerce," 9 U.S.C. § 2, governs this dispute. Under the FAA, an arbitration agreement "arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* "Although it is often said that there is a federal policy in favor of arbitration, federal law places arbitration clauses on equal footing with other contracts, not above them." *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 740 (7th Cir. 2010) (citing *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010)). That is, the FAA was intended to respect parties' agreements to arbitrate and "put arbitration on a par with other

contracts and eliminate any vestige of old rules disfavoring arbitration." *Stone v. Doerge*, 328 F.3d 343, 345 (7th Cir. 2003).

If the parties have a valid arbitration agreement and the asserted claims in a lawsuit are within its scope, then the arbitration requirement must be enforced. 9 U.S.C. §§ 3-4; *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004) (citing *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999)). Whether a binding arbitration agreement exists is determined under principles of state contract law. *Janiga*, 615 F.3d at 742 (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 934 (1995)). And "the party seeking to invalidate or oppose the arbitration agreement bears the burden of demonstrating that the arbitration agreement is unenforceable and that the claims are unsuitable for arbitration." *Paragon Micro, Inc. v. Bundy*, 22 F. Supp. 3d 880, 887 (N.D. Ill. 2014) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000)). The FAA also "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

### III. Analysis

Joseph argues that the Arbitration Agreement is invalid because he never had the authority to bind Samuel to arbitration under the Illinois and Arizona POAs. Emeritus responds that both POAs established an agency relationship and expressly gave Joseph the power to enter into the Arbitration Agreement.

Some basic agency principles are the same in Illinois and Arizona. An agent's authority to act for the principal can be either actual or apparent. *See Patrick Eng'g, Inc. v. Naperville*, 976 N.E.2d 318, 329 (Ill. 2012); *Ruesga v. Kindred Nursing Ctrs., LLC*, 161 P.3d 1253, 1261 (Az. Ct. App. 2007). In turn, actual authority—meaning the principal *actually* gave authority to the agent—can be either express or implied. *Id.* "Express authority is directly granted to the agent in express terms by the principal and extends only to the powers the principal confers upon the agent." *Curto v. Illini Manors, Inc.*, 940 N.E.2d 229, 233 (Ill. App. Ct. 2010). One way to confer express authority is through a power of attorney. *See id.* ("[Express] authority may be granted through a written contract, a power of attorney or a court-ordered guardianship." (citations omitted)); *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 759 N.E.2d 174, 181 (Ill. App. Ct. 2001) ("The power of attorney lists specific powers given to the attorneys-in-fact."). The other form of actual authority is implied authority, which "arises when the conduct of the principal, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's behalf." *Curto*, 940 N.E.2d at 233. Separate from actual authority is apparent authority, which applies even when the principal has not actually given the agent any authority; put another way, apparent authority exists "where a principal has created the appearance of authority in an agent, and another party has reasonably and detrimentally relied upon the agent's authority." *Patrick*, 976 N.E.2d at 329-30 (citations omitted). The party alleging an agency relationship must prove it by a preponderance of the evidence. *See Granite Properties Ltd. P'ship*

*v. Granite Inv. Co.*, 581 N.E.2d 90, 92 (Ill. App. Ct. 1991); *Curran v. Indus. Comm'n of Ariz.*, 752 P.2d 523, 526 (Az. Ct. App. 1988).

In the earlier opinion, the Court rejected the arguments that Joseph had actual implied authority or apparent authority to sign the Arbitration Agreement for his father. 9/4/15 Opinion at 20-22. What's left is whether the Illinois and Arizona POAs gave Joseph the actual, express authority to bind Samuel to the Arbitration Agreement.

## A. Illinois Health Care Power of Attorney

On the Illinois POA, the crux of the parties' dispute is whether entering into an optional arbitration agreement with an assisted living facility is a "healthcare decision."[3] The Illinois POA was created under a state law that makes it easier for someone to delegate healthcare decisions to an agent and provides a standard form to execute a power of attorney. 755 ILCS 45/4-10. The Illinois POA "authorizes the agent to make any and all health care decisions on behalf of the principal," including admission and discharge "from any and all types of hospitals, institutions, homes, residential or nursing facilities, treatment centers, and other health care institutions … ." 755 ILCS 45/4-10(c). The statute also has an enabling clause that

---

[3]As previously explained, the Illinois POA refers to the document signed on June 9, 2010. R. 20-2, Exh. 2. In this round of briefing, Joseph attached a second Illinois Statutory Short Form Power of Attorney for Health Care, dated November 1, 2010, that is similar to the June document. R. 21-2, Exh. B. Neither party mentioned the different date or explained its significance (or lack of it). The main differences between the two documents appear to be that the November version terminates on Samuel's written direction (instead of on his death) and includes a successor agent. *Id.* The parties do not argue that the outcome of this motion to compel depends on whether the June or November version was in effect at the time that Joseph signed the Arbitration Agreement, so the Court will treat the June version as the pertinent one, as the parties did during both rounds of briefing on the motion to compel.

gives the agent the authority to carry out the other powers: the agent "may sign and deliver all instruments, negotiate and enter into all agreements and do all other acts reasonably necessary to implement the exercise of the powers granted … ." *Id.*

In arguing their positions, both parties rely on an Illinois Appellate Court decision, *Fiala v. Bickford Senior Living Group*, 32 N.E.3d 80 (Ill. App. Ct. 2015). That case considered whether an agent acting under a statutory short form power of attorney for healthcare (like the one at issue here) could sign a binding arbitration clause as part of admission to a long-term care facility. *Fiala*, 32 N.E.3d at 84. The plaintiff's daughter signed, on her father's behalf, a residency contract with an assisted living facility that contained a mandatory arbitration provision. *Id.* The Illinois Appellate Court held that the daughter did have the authority to bind her father. *Id.* at 92. The reasoning went like this: deciding to live in the facility was a healthcare decision, and the arbitration provision was neither optional nor freestanding, but instead was an *integral* part of the patient's underlying admission. *Id.* In so deciding, *Fiala* relied on cases from other states that had refused to enforce an arbitration agreement in the *converse* of the situation, that is, "where the arbitration provision is *optional* or otherwise not necessary to gain admission to a long-term-care facility, [in which case] the agent acting pursuant to a health-care power of attorney is not authorized to sign the arbitration provision and the patient cannot be bound by the agent's action." *Id.* (emphasis added) (citing *Dickerson v. Longoria*, 995 A.2d 721, 739 (Md. 2010); *Life Care Ctrs. of Am. v.*

*Smith*, 681 S.E.2d 182, 185 (Ga. Ct. App. 2009); *Koricic v. Beverley Enterprises–Neb., Inc.*, 773 N.W.2d 145, 151 (Neb. 2009)).

Emeritus says *Fiala* helps its case because "[t]he Arbitration Agreement was presented to Joe Testa during the admission process … along with the other admission documents in *direct relation* to his father's health and medical care." R. 20, Def.'s Br. at 10-11 (emphasis in original). But "direct relation" is not the same as *necessary*. The Arbitration Agreement—which Emeritus drafted—makes clear that Samuel's admission into Emeritus was *not contingent* upon signing the Arbitration Agreement. It says: "Admission to the Community is not contingent upon signing this Agreement." Arbitration Agreement at 4. The timing of each agreement's execution also bears out the independence of the two agreements. Joseph signed the Arbitration Agreement on November 22, 2012, three weeks *after* signing the Establishment Contract for Samuel's admission to Emeritus. So the Arbitration and Establishment Contracts were independent, and the separate promise to arbitrate was not a necessary condition to Samuel's admission to the facility or receipt of services or benefits. *See* 9/4/15 Opinion at 22-23. This distinguishes *Fiala*, and it means that Joseph's signing of the Arbitration Agreement was not "reasonably necessary" to implement a healthcare decision. *See* 755 ILCS 45/4-10(c); *Fiala*, 32 N.E.3d at 91-92.

This holding does not discount the Federal Arbitration Act, which "places arbitration clauses on equal footing with other contracts," *Janiga*, 615 F.3d at 740 (citations omitted), and also requires federal-court vigilance against potential state-

court hostility to arbitration clauses, *see DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 469-70 (2015). Illinois state courts can draw the line that they did in *Fiala* without prompting suspicion of impermissible hostility toward arbitration. The Illinois Appellate Court applied a principle of agency law that applies to all types of non-arbitration-related decisions: "the general rule limits the scope of a health-care power of attorney to matters involving the principal's health care and that the agent is given no authority over the principal's property or financial matters." *Fiala*, 32 N.E.3d at 91 (citing *In re Estate of Stahling*, 987 N.E.2d 1033, 1038 (Ill. App. Ct. 2013) (a short form healthcare power of attorney did not create a fiduciary relationship in which property transactions between the principal and agent automatically resulted in a presumption of undue influence)). If an arbitration agreement is not necessary for the healthcare decision (that is, to live in an assisted living facility), then the agent is going too far. Indeed, far from signaling hostility to arbitration, remember that *Fiala* actually *enforced* an arbitration clause, because "health-care decisions, such as placement in an assisted-living facility, are not so cut and dried." *Id.* When an arbitration clause is a necessary part of the facility's main residency-establishment contract, then the decision to enter into the arbitration clause is "part and parcel" of a healthcare decision rather than a separate financial decision. *Id.* at 92. Drawing this line is sensible, because *Fiala* was reconciling two competing concerns: the potential overreaching of the healthcare power of attorney and the necessity of the arbitration agreement to the healthcare facility's residency contract. In addition to the cases that *Fiala* cited,

other state courts have also drawn this same distinction between optional and mandatory arbitration provisions. *E.g.*, *Primmer v. Healthcare Indus. Corp.*, 43 N.E.3d 788, 795 (Ohio Ct. App. 2015) ("The decision to sign a free-standing arbitration agreement is not a health care decision if the patient may receive health care without signing the arbitration agreement."); *State ex rel. AMFM, LLC v. King*, 740 S.E.2d 66, 75 (W. Va. 2013) (same); *but see Hogan v. Country Villa Health Servs.*, 55 Cal. Rptr. 3d 450, 455 (Cal. Ct. App. 2007) (signing an arbitration agreement, whether optional or mandatory, is "part of the health care decisionmaking process").[4]

The careful line drawing is also consistent with other Illinois cases that construe powers of attorney narrowly. In *Estate of Nicholls v. Nicholls*, a nephew acting under a power of attorney from his uncle made himself the beneficiary of his uncle's certificates of deposit. 960 N.E.2d 78, 79-80 (Ill. App. Ct. 2011). The nephew had plenty of provisions to rely on in the power of attorney, but he still lost. *Id.* For example, the power of attorney gave the nephew the power to "acquire and redeem certificates of deposit." *Id.* He also had broad general powers "[t]o exercise, do, or perform any act, right, power, duty or obligation whatsoever that [the principal] now ha[s] or may acquire, relating to any person, matter, transaction or property,

_____

[4] Emeritus argues that the Court should not follow *Fiala* because the "Illinois Supreme Court has not decided this issue and … decisions by intermediate state courts are not necessarily authoritative or binding in federal court." Def.'s Br. at 12. Although it is true that lower state-court cases are not binding, they help federal courts "use [their] own best judgment to estimate how the [state's] Supreme Court would rule as to its law." *Knoblauch v. DEF Exp. Corp.*, 86 F.3d 684, 687 (7th Cir. 1996) (citation omitted). When the Illinois Supreme Court has not directly addressed an issue, lower courts that "have grappled with the issue" help to "offer [federal courts] a clear indication of the law of Illinois." *Id.*

real or personal, tangible or intangible," and any specifically enumerated powers were not meant to "limit or restrict" the nephew's general powers. *Id.* at 81-82. Despite all this textual support in the power of attorney, the Illinois Appellate Court held that the "catch all" language could not make up for the absence of an express provision allowing the nephew to change beneficiaries. *Id.* at 83.

In reaching this conclusion, *Nicholls* relied in part on the commentary in the Restatement of Agency, much of which tries to limit the breadth of catch-all provisions. One comment says that "where general terms are used which literally purport to grant great authority, such terms will normally be interpreted as authorizing the agent to act only in connection with the business the agent is employed to perform. The more specific the enumeration of acts to be done, the smaller the area to be included in the general statement." Restatement (Second) of Agency § 37 cmt. a (1958). Another reads: "All-embracing expressions are discounted[,] discarded[, or] disregarded as meaningless verbiage." *Id.* § 34 cmt. h (1958) (giving example of phrase like "hereby ratifying and confirming whatever our agent shall do"). Other decisions also rely on these comments to narrow the reach of powers of attorney. *See, e.g.*, *Amcore Bank*, 759 N.E.2d at 182 ("[A] general grant of agency does not carry with it the power to execute guaranties."); *Fort Dearborn Life Ins. Co. v. Holcomb*, 736 N.E.2d 578, 589 (Ill. App. Ct. 2000) ("No matter how the power is characterized, a 'catchall' provision will not operate to expand powers expressly limited in other portions of the same instrument."); *Ping v. Beverly*

*Enters.*, 376 S.W.3d 581, 591-93 (Ky. 2012) (no actual authority to enter arbitration agreement with nursing home on mother's behalf).

To be sure, *Nicholls* involved a durable power of attorney, rather than a statutory short form healthcare power of attorney like the one at issue here. But the case still makes the point that a "written power of attorney must be strictly construed so as to reflect the 'clear and obvious intent of the parties.'" *Id.* at 82 (quoting *Fort Dearborn*, 736 N.E.2d at 583-89). And *Nicholls* explained that "it does not matter whether the power of attorney at issue [was] a short form or a durable power of attorney," because "the result [was] the same." *Id.* at 82. Because there was no specific reference to changing beneficiaries on the certificates of deposit, the nephew did not have the authority to do so despite a broad provision allowing him "[t]o exercise, do, or perform any act, right, power, duty or obligation whatsoever." *Id.* at 81. Here too, even the broadly worded provisions in the Illinois POA do not stretch so far as to cover an arbitration clause that is not "reasonably necessary," 755 ILCS 45/4-10(c), to carry out a healthcare decision.

## B. Arizona Durable Power of Attorney

### 1. Litigation Provision

Emeritus next argues that the Arizona POA, which is not limited to healthcare decisions, separately granted Joseph the authority to bind Samuel to the Arbitration Agreement. This power of attorney was created under Arizona's durable power of attorney statute. ARS § 14-5501. Article I of the Arizona POA governs "Asset Control" and broadly provides that the "agent shall have full power and

authority to do any and all acts for [Samuel's] benefit which [he] might do if [he] were present." Arizona POA, art. I; Def.'s Br. at 7-8. Article I then sets forth specific examples—"by way of illustration but not by way of limitation"—of Joseph's powers. Emeritus's best argument is premised on the litigation-related provision, which says that Joseph may

> retain counsel on [Samuel's] behalf, to appear for [him] in all actions and proceedings to which [he] may be party in the courts of Arizona or elsewhere, to commence actions and proceedings in [his] name and to sign and verify in [his] name all complaints, petitions, answers and other pleadings of every description.

Arizona POA, art. I ¶ 9. Whether this provision grants Joseph authority to enter the Arbitration Agreement is a very close call.

There is no Arizona case law directly on point, so the Court must return to first principles. Like in Illinois, Arizona courts take a narrow view of powers of attorney, long recognizing "that under all the authorities powers of attorney should be strictly construed and that the courts should never by construction extend the power they confer beyond that given in terms, or is absolutely necessary to carry that conferred into effect." *Lightning Delivery Co. v. Matteson*, 39 P.2d 938, 941 (Ariz. 1935) (power of attorney allowing husband to "legally dispose of any and all properties … belonging to us" covered only marital property, not wife's separate property). This is a clear-statement rule for grants of authority: "[i]f … authority is intended to be conferred, the language used in conferring it should be so clear, distinct, and certain in its meaning to that end as to leave no room for doubting that such is its purpose." *Brown v. Armenta*, 188 P. 260, 262 (Ariz. 1920) (citation and

quotations omitted) (power of attorney allowing agent to "reclaim" land did not allow agent to lease land). Arizona courts have also relied on the Restatement of Agency, which similarly requires "that a principal has stated [express authority] in very specific or detailed language." *Ruesga*, 161 P.3d at 1261 (quotations omitted) (quoting Restatement (Third) of Agency § 2.01 cmt. B). These requirements are in place to guarantee that that the power of attorney reflects the clear intention of the principal. *See* ARS § 14-5501(D)(1) (durable powers of attorney must include "language that clearly indicates that the principal intends to create a power of attorney.").

When read with these principles in mind, the litigation provision does not grant Joseph the authority to enter into an arbitration agreement because there is no explicit mention of that type of authority. Remember that the litigation provision allows Joseph to "appear" in and "commence" actions and proceedings for Samuel, Arizona POA, art. I, ¶ 9, but there is no express statement that Joseph may agree— even before a dispute arises—to arbitrate legal claims that might later need to be resolved. Without that explicit grant of authority, the litigation provision does not contain the kind of "clear, distinct, and certain" language that "leave[s] no room for doubt[]" demanded by Arizona courts. *Brown*, 188 P. 260 at 262. Samuel did not grant Joseph the actual, express authority to enter into the arbitration agreement, so it does not bind Samuel.[5]

---

[5] Emeritus argues that the Arizona POA contemplated arbitration because the litigation provision that says Joseph can appear for Samuel in "the courts of Arizona or elsewhere," Arizona POA, art. I, ¶ 9, and the "elsewhere" is, according to Emeritus, arbitration. But it is not self-evident that "elsewhere" refers to non-judicial forums, like

It is worth noting what this holding does *not* mean. The litigation provision might very well be explicit enough to permit Joseph to decide how to litigate a claim *after* it arises—even including a decision to take the claim to arbitration (if the opponent were to agree, of course). This is the distinction that was drawn by the Kentucky Supreme Court in *Extendicare Homes, Inc. v. Whisman*, — S.W.3d —, 2015 WL 5634309, at *10 (Ky. Sept. 24, 2015), *as corrected* (Oct. 9, 2015).[6] In *Extendicare*, the Kentucky Supreme Court distinguished between, on the one hand, the act of initiating (or defending against) an arbitration proceeding and, on the other hand, the signing of a *pre*-dispute arbitration agreement. *Id.* The power of attorney in that case gave the agent the power to "institute or defend suits," which "would necessarily encompass the power to make litigation-related decisions within the context of a suit so instituted." *Id.* After the suit's filing, the agent could decide to submit the claim to arbitration because that would be a litigation-related decision. *Id.* at *11. But agreeing to arbitrate *before* the claim arose could not be a

_____

arbitration, instead of *courts* in states other than Arizona. In any event, Emeritus's argument does not address the confines of the litigation provision, which says nothing about agreeing to arbitrate claims before they even arise.

[6]On the Kentucky Supreme Court's website, the final *Extendicare* opinion is labeled "to be published" and is dated February 18, 2016. *See* http://apps.courts.ky.gov/supreme/sc_opinions.shtm. Opinions labeled "to be published" may be cited in Kentucky courts, although not until they are finalized. *Id.* (explaining that so-labeled opinions "shall not be cited until all steps in the appellate process have been exhausted and they become final"). In contrast, opinions labeled "not to be published" "shall not be cited or used as binding precedent in any other case in any court of this state." Ky. CR 76.28(4)(c). As far as the Court can tell, the final version of *Extendicare* on the Kentucky Supreme Court's website is the same version that is currently on Westlaw—both versions were revised on October 9, 2015.

Even without considering *Extendicare*, however, the outcome remains the same under published Arizona authority and the Restatement—the litigation provision of the Arizona POA does not grant Joseph the authority to enter into an arbitration agreement because there is no explicit mention of that type of authority.

litigation-related decision connected to the claim because, by definition, no claim existed yet. *Id.*

Here too perhaps the litigation provision gives Joseph the authority to submit a claim to arbitration *after* the claim arises, because the litigation provision does give Joseph the power to "sign … pleadings of every description." Arizona POA, art. I, ¶ 9. That could be interpreted to mean a pleading in which Joseph, on Samuel's behalf, agrees to a bench trial or to arbitration. There is no need to decide the question definitively, because Joseph of course resists arbitration, but it is worth pointing out that *after* a claim arises, Joseph still retains broad power to make litigation decisions for Samuel.

## 2. Healthcare Provision

Emeritus next relies on the healthcare provision of the Arizona POA as the source of Joseph's purported authority to enter into the Arbitration Agreement. Def.'s Br. at 9-10. Article II of the Arizona POA governs healthcare decisions and allows Joseph

> to make decisions regarding [Samuel's] medical care and treatment including, but not limited to … approving or withholding approval for hospitalization or other placement, and consulting with physicians and other medical personnel to determine the best and most appropriate course of treatment or, if appropriate most reasonable and comfortable limitations on treatment.

Arizona POA, art. II, ¶ 1. In staking out their positions over the Arizona healthcare provision, the parties basically repeat their arguments over the Illinois POA. Emeritus argues that "[t]he decision to arbitrate disputes arising out of the provision of assisted living and healthcare services is related to Sam Testa's

admission to Emeritus Assisted Living" and "his health and medical care." Def.'s Br. at 9. Joseph responds that "[t]he decision to arbitrate is not even remotely related to healthcare" unless "arbitration is a condition of admission to a healthcare facility." Pl.'s Resp. at 7.

Without Arizona case law directly on point, again the general principles on powers of attorney carry the day. No language in the healthcare provision clearly authorizes Joseph to enter into an arbitration agreement that is not necessary for the receipt of healthcare. Remember that Emeritus's residency contract does not require the arbitration agreement, so Joseph could have secured the assisted living arrangement without agreeing to arbitrate future disputes. Indeed, the healthcare section of the Arizona POA is even narrower than the Illinois POA. The Arizona POA, art. II, ¶¶ 2-3, does not include an enabling-type provision like the Illinois POA; that is, there is *no* section of the POA allowing "[t]he agent [to] sign and deliver all instruments, negotiate and enter into all agreements and do all other acts reasonably necessary to implement the exercise of the powers granted to the agent." 755 ILCS 45/4-10(c). Nor does the Arizona POA specify that it "is intended to be as broad as possible so that [Joseph] will have authority to make any decision [Samuel] could make to obtain or terminate any type of health care." Illinois POA ¶ 1. If the broader grant in the Illinois POA was not enough to cover signing an optional arbitration agreement, then the Arizona POA too does not.

There is one Arizona appellate court case suggesting the state's courts would draw the line at optional versus mandatory arbitration agreements, as other states

like Illinois have done. *See supra* Section III.A. In *Hurst v. Silver Creek Inn, L.L.C.*, the Court of Appeals considered an Arizona statute, ARS § 36-3231(A)(2), which allows an adult child to make healthcare decisions for a parent. 2015 WL 3551874, at *5 (Ariz. Ct. App. June 4, 2015). An assisted living facility tried to hold a resident to an arbitration agreement signed by the resident's adult child, but the Court of Appeals rejected the argument, on the ground that the arbitration agreement was not a condition of residency: "[w]hether to agree to arbitration is not a health care decision, particularly where, as here, the agreement to arbitrate is not a condition of admission or treatment." *Id.* To be sure, *Hurst* is an unpublished decision, so it has "persuasive value" only, Ariz. S. Ct. R. 111(c)(1)(C),[7] but it is consistent with case law in other states that categorize an optional arbitration agreement as unnecessary to a healthcare decision.

The cases cited by Emeritus do not support its argument. Emeritus cites two Arizona cases, Def.'s Br. at 5-7, but in neither case did the parties or the courts address the threshold issue of whether the powers of attorney granted the agents the authority to enter into the arbitration agreement in the first place. In *Estate of Harmon v. Avalon Care Ctr. – Scottsdale, L.L.C.*, 2015 WL 302292, at *2 (Ariz. Ct. App. Jan. 22, 2015), the court held that an arbitration agreement was not binding

---

[7]Arizona Supreme Court Rule 111(c) allows a non-precedential decision to be used "for persuasive value, but only if it was issued on or after January 1, 2015" and if "no opinion adequately addresses the issue before the court." Ariz. Sup. Ct. R. 111(c)(C). Even without considering *Hurst*, however, the outcome would be the same under published Arizona authority and the Restatement—that the healthcare provisions of the Arizona POA do not encompass signing an optional arbitration agreement.

on non-signatory heirs.[8] The daughter, who signed the arbitration agreement for her father under a power of attorney, could pursue a wrongful death claim because those claims belonged to the statutory *beneficiaries*, and not to the decedent. 2015 WL 302292, at *2. The opinion did not discuss (and did not need to decide) whether the daughter could bind her *father*, as distinct from the beneficiaries. (The court also held that, in any event, the arbitration agreement was unconscionable. *Id.*) The other Arizona case cited by Emeritus, *Duenas v. Life Care Ctrs. of Am., Inc.*, 336 P.3d 763 (Ariz. Ct. App. 2014), similarly did not discuss whether an agent could agree to arbitrate; the court simply held that an express provision attempting to bind statutory heirs to arbitrate wrongful death claims was unenforceable. 336 P.3d at 772. So neither of the Arizona cases cited by Emeritus examined the text of a power of attorney to determine whether it granted authority to bind a principal to an agreement to arbitrate.

Moving out of state, Emeritus also cites a Kentucky Court of Appeals case, Def.'s Br. at 8, but it is distinguishable. In *Kindred Healthcare, Inc. v. Cherlois*, — S.W.3d —, 2013 WL 5583587, at *1 (Ky. Ct. App. Oct. 11, 2013),[9] the power of attorney allowed the agent "to transact, handle, and dispose of all matters affecting me and/or my estate in any possible way." Because that power of attorney had "no limitation on its scopes or objectives," the court could "find no reasonable

---

[8] *Estate of Harmon* is unpublished, but the Court does not rely on this case, not even "for persuasive value" as permitted by Arizona Supreme Court Rule 111(c).

[9] *Kindred Healthcare* is labeled "to be published" but has not yet been finalized. Opinions labeled "to be published" may not be cited in Kentucky courts until they are finalized. *See* http://apps.courts.ky.gov/supreme/sc_opinions.shtm. But as explained above, the Court does not rely on *Kindred Healthcare* to reach its conclusion.

interpretation of the document which would limit" the agent's authority. 2013 WL 5583587, at *5. Here, Article II of the Arizona POA, in contrast, is limited to healthcare decisions.[10]

Emeritus's last argument is that the healthcare provisions authorized Joseph to sign the Arbitration Agreement because Article III of the Arizona POA, the "administrative provisions," states that "[t]his instrument shall be governed by the laws of the State of Arizona in all respects … [and] shall be applicable to all property of mine, real, personal, intangible or mixed … ." Arizona POA, art III. Emeritus equates Samuel's personal-injury claim to an "intangible property interest relating to a lawsuit for money damages." Def.'s Br. at 9. There is no reason to quibble over whether the personal-injury claim is a form of personal property, intangible property, or something else. The claim is property of some sort, but that is neither here nor there, because Article III of the Arizona POA does not grant any authority beyond the other articles. Article III simply explains that any authority granted by other provisions shall apply to all types of property interests. But no other provision gave Joseph the authority to agree to arbitrate disputes before they

---

[10]Emeritus stresses that it is not relying on the catchall provision of the Arizona POA as a source of authority. *See* Def.'s Br. at 8 ("The Defendant is not relying on general terminology in a catchall provision in the power of attorney … ."); R. 22, Def.'s Reply at 6 ("In the case at bar, Emeritus is not relying on a catc[h]all provision or a general grant of power."). The catchall provision of the Arizona POA is found in the introduction to Article I: "My agent shall have full power and authority to do any and all acts for my benefit which I might do if I were present … ." Arizona POA, art. I. Even if Emeritus did argue that this provision supplied Joseph with the requisite authority, it would likely be unsuccessful. The Restatement of Agency, which Arizona follows, generally looks unfavorably on broad grants of authority to agents. *See supra*.

arose, and to enter into that agreement when it was unnecessary to do so for admission into Emeritus's facility.

### IV. Conclusion

Neither the Illinois POA nor the Arizona POA gave Joseph the authority to enter into the Arbitration Agreement with Emeritus. So the Arbitration Agreement does not bind Samuel, and Emeritus's motion to compel arbitration, R. 8, is denied. At the next status hearing, the Court will set the answer deadline and the discovery schedule.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 7, 2016